OPINION
Appellant, Milcrest Nursing Center ("Milcrest"), appeals from an order of the Ohio Department of Health ("ODH") granting a certificate of need ("CON") to appellee, Union Manor Nursing Home ("Union Manor").
On April 21, 1998, Union Manor, a one hundred twelve bed long-term care facility owned by Union County, Ohio, and operated by Memorial Hospital of Union County ("Memorial"), a Union County owned hospital, filed a CON application with ODH proposing to replace Union Manor with a new one hundred twelve bed facility in Marysville, Ohio, to be called The Gables at Green Pastures ("The Gables"). According to the proposal, the new facility is to be comprised of forty-six traditional nursing home beds, a thirty-bed dementia unit, and a thirty-six bed distinct Medicare unit. No additional long-term care beds are proposed in the application.
The director of ODH assigned the matter to a CON consultant for review of the application. The consultant requested additional information, which was provided by Union Manor. On June 11, 1998, the consultant declared the CON application complete.
On July 10, 1998, Milcrest, a long-term care facility in Union County located near the proposed site for The Gables, filed a written objection to Union Manor's CON application.
Pursuant to R.C. 3702.52(C)(3), an adjudication hearing was held on September 17, 18 and 24, 1998. Following the hearing, the hearing examiner issued a fifty-two page report and recommendation containing fifty-seven findings of fact and fifteen conclusions of law. Based on such findings and conclusions, the hearing officer recommended that the application be approved. Milcrest filed no objections to the hearing examiner's report and recommendation. The director of ODH accepted the hearing examiner's recommendation and approved the application. Milcrest filed a notice of appeal in this court and advances the following assignments of error:
 [1.] The Director erred in finding that the written report of the architect selected by Memorial Hospital of Union County in 1996 documents the circumstances that make renovation of Union Manor less feasible than the replacement of Union Manor, and therefore satisfies the requirements of Ohio Administrative Code ("O.A.C.") § 3701-12-232(D).
 [2.] The Director erred in finding that the certificate of need application should be granted on the basis of O.A.C. § 3701-12-20(G) * * * because there are no feasible alternatives to the replacement of the existing facility, Union Manor.
 [3.] The Director erred in finding that O.A.C. § 3701-12-20(J) * * * supports the certificate of need application because the current and long-term financial feasibility of the replacement project and its financial impact do not negatively affect the applicant, other providers, health care consumers and the Medicaid program.
 [4.] The Director erred in finding that the replacement of the existing facility was needed, pursuant to O.A.C. § 3701-12-20(E) * * * and that the certificate of need would be in accordance with Ohio Revised Code ("O.R.C.") §§ 3702.51 to 3702.62, or rules adopted under O.R.C. § 3702.57.
 [5.] The Director erred in finding that the proposed replacement project should be granted in spite of the adverse impact, pursuant to O.A.C. § 3701-12-20(F)1 * * * on other providers of similar services in the health service area (H S A), including consideration of the impact on utilization, market share and financial status.
 [6.] The Director erred in finding that, pursuant to O.A.C. § 3701-12-20(I) * * * the replacement project will not reduce the effectiveness of Union County's county home in meeting the health-related needs of medically underserved groups.
R.C. 3702.60(B) provides that any affected person that was a party to and participated in the adjudication hearing may appeal the director's decision to the Tenth District Court of Appeals. R.C. 3702.60(F)(3) sets forth the standard of review to be applied by this court and provides:
 The court shall affirm the director's order if it finds, upon consideration of the entire record and any additional evidence admitted under division (F)(2) of this section, that the order is supported by reliable, probative, and substantial evidence and is in accordance with law. In the absence of such a finding, it shall reverse, vacate, or modify the order.
In considering this appeal, this court may engage in only a very limited weighing of the evidence and may not substitute its judgment for that of the director with regard to the weight and credibility of the evidence. This court must affirm the director's decision if it is supported by reliable, probative and substantial evidence and if the director properly applied the law to the findings of fact. In the Matter of: ManorCare of Kettering (Dec. 31, 1992), Franklin App. No. 92AP-208, unreported (1992 Opinions 6492, 6497).
Milcrest's assignments of error essentially challenge the factual findings made by the hearing examiner and accepted by the director of ODH. It is, therefore, incumbent upon Milcrest to demonstrate that the factual findings are not supported by reliable, probative and substantial evidence. Absent such demonstration, this court may not substitute its judgment for that of the director.
Because the first and second assignments of error are interrelated, we will address them together.
Pursuant to Ohio Adm. Code 3701-12-232(D), an applicant for a CON must demonstrate that the replacement of the facility or the relocation of beds is "more cost-effective or otherwise more feasible" than renovation of the facility from which the beds are being located. Ohio Adm. Code 3701-12-232(D) also provides that such information "shall be provided in the form of a detailed study of the respective costs of renovation and replacement or relocation * * * or documentation of the circumstances that make renovation otherwise less feasible." In addition, Ohio Adm. Code3701-12-20(G) provides that the director of ODH must "consider alternatives to the project and the advantages, disadvantages and costs of each alternative."
In arguing that Union Manor did not comply with the requirements of Ohio Adm. Code 3701-12-232(D) and that the director did not consider any alternatives to the project, Milcrest focuses exclusively upon the sufficiency of an architect's report submitted by Union Manor which analyzed the feasibility of renovating the existing facility instead of building a replacement facility. Specifically, Milcrest argues that the architect's report does not constitute a "detailed study of the respective costs of renovation and replacement or relocation * * *." Upon review of the architect's report, we note that it does not contain an estimate of the costs involved in renovating the existing facility. However, the report is replete with evidence of the substandard condition of the existing facility. In addition, Danny Boggs, President of Memorial Hospital, testified that the existing facility is "very run down," (Tr. Vol. I, p. 80) and specifically noted several major problems with the plumbing, HVAC, and electrical systems. Boggs also testified that renovation of the facility would be very difficult due to the nature of the plumbing, HVAC and electrical systems problems and because the building is a concrete block structure. Boggs further testified that from a logistical standpoint, it would be very difficult to manage a renovation project. As an example, Boggs stated that significant safety issues were involved in replacing the plumbing and electrical systems while at the same time trying to serve the facility's eighty-plus residents.
Boggs also testified at length regarding the planning process that occurred in determining whether to renovate or replace the existing facility. This planning process included, but was not limited to, the selection and engagement of an independent architect to conduct a detailed feasibility study on the cost of remodeling the existing facility versus building a new facility. At the conclusion of the study, the architect rendered a report itemizing the needed renovations. According to Boggs, in addition to the report, the architect advised Memorial that renovating Union Manor would cost only about $400,000 to $500,000 less than building a new replacement facility.
The hearing examiner, in considering the renovation versus relocation issue, stated:
 The evidence in the record is overwhelmingly persuasive on the physical deficiencies of the present facility, Union Manor. The architect's 1996 feasibility study issued to Memorial Hospital of Union County describes a structure that is too small and so severely worn down in its physical plant and systems as to be unable to meet the needs and rights of residents served at Union Manor. Beyond the space limitations of Union Manor, offering space below state of Ohio requirements for space per resident, almost every physical system at Union Manor, from plumbing to electrical, to safety, to handicapped access, is outdated, tired, and in need of replacement. Any consideration of removing and replacing these systems while the structure is occupied by long-term care residents conjures up extremely complicated, hazardous, near impossible conditions.
 If the existing facility, Union Manor, is inadequate to meet the needs and rights of private pay, Medicare, and Medicaid residents, only two alternatives are presented: the renovation of the existing facility or the replacement of the existing facility. Considering the extreme difficulties associated with the renovation of Union Manor, and the relatively small difference ($500,000) between the cost of renovating Union Manor and the cost of a new facility, the replacement facility, based on a preponderance of the evidence presented, is the better choice as it is feasible, while renovation is less feasible. [Report and Recommendation at 34-35.]
In addition, in finding of fact number 43, the hearing examiner found, as follows:
 Because of the extreme difficulties in renovating an aged facility wherein more than eighty residents are living, the replacement of Union Manor with a new facility is the more feasible alternative between renovation and replacement.
An argument similar to the one advanced by Milcrest in the instant case was raised in In the Matter of: Mill Run CareCenter (Dec. 20, 1994), Franklin App. No. 94APH04-591, unreported (1994 Opinions 5946). In Mill Run, the appellant argued that the CON applicant had not demonstrated, as required by Ohio Adm. Code 3701-12-232(D), that the relocation of nursing home beds was "more cost-effective or otherwise more feasible" than renovation of the existing facility from which the beds were being located because the applicant had not provided a detailed study of the respective costs of renovation versus relocation. In rejecting this argument, this court stated:
 While appellants take issue with appellees' failure to provide a mandatory comparative analysis ("detailed study") of the cost and feasibility of renovation versus relocation, substantial documentary and other evidence was presented which indicated that the cost of renovation would be so extensive than an ordinary person could easily make the determination that renovation was not feasible. * * * [Id. at 5949.]
In our view, the evidence presented by Union Manor clearly documents "the circumstances that made renovation otherwise less feasible" and establishes that the cost of renovating the existing facility will be so extensive that an ordinary person can easily determine that renovation is not cost-effective and is not feasible. Milcrest provided no contrary evidence as to the condition of the existing facility or that renovation of the existing facility would be more cost effective or more feasible than relocation of the beds to a new facility. Thus, there is reliable, probative and substantial evidence to support the finding that the existing facility is in substandard condition and that replacement of the facility is more cost effective and otherwise more feasible than renovation of the facility. Accordingly, the first and second assignments of error are overruled.
By the third assignment of error, Milcrest argues that the director erred in determining that the replacement project is financially feasible. Ohio Adm. Code 3701-12-20(J) provides, in pertinent part, that the director must consider "current and long-term financial feasibility of the project and its financial impact upon the applicant, other providers, health care consumers and the medicaid program established under Chapter 5111. of the Revised Code. * * * " In support of the project's financial feasibility, Boggs testified that since January 1, 1995, Union Manor has operated at a loss due, in large part, to the substandard condition of the facility. As a result, Memorial has advanced over $2 million to Union Manor in order for Union Manor to maintain operations. Boggs also testified that if the existing facility is not replaced or renovated, Union Manor will continue to operate at a loss of approximately $500,000 per year.
Boggs further testified that increased revenues, as well as a significant reduction in the outstanding debt owed from Union Manor to Memorial, are projected for the replacement project. Boggs testified that these projections are based on assumptions regarding changes in occupancy rates and resident payor mix (a drop in the percentage of Medicaid residents coupled with a significant increase in the percentage of Medicare and private pay residents), average length of stay, and level of Medicare reimbursement rates. Boggs characterized the projections as "conservative," because the projections "only look at the discharges of Memorial Hospital, and we only have 50 to 55 percent of the med/surg admissions for residents from Union County * * * [and] because the residents of Union County only make up 60 percent of our market * * * [and] because, although we were aggressive with the Medicare capture rate and days, we were also aggressive with the expenses." [Tr. Vol. II, pp. 161-162.]
Milcrest's expert, Timothy J. Lehman, testified that the replacement project is not financially feasible because Union Manor's projections (and the underlying assumptions on which the projections were based) are unrealistic and unreasonable. Lehman specifically took issue with Union Manor's projections regarding both the volume of and reimbursement rates for Medicare residents in the new facility.
Regarding the issue of financial feasibility, the hearing examiner stated:
 The hearing examiner finds Milcrest Nursing Center's arguments about the unreliability of the projections made by Union Manor as to occupancy rate and payor mix, reimbursement rate and average length of stay at the proposed facility to be credible. The hearing examiner is nonetheless persuaded that even if these projections prove to be too optimistic, their imprecision does not mean the proposed project is not financially feasible. There is included in the record of this proceeding credible evidence of the financial drain posed by the existing facility. There is insufficient evidence in the record to show that Union Manor's projection of financial feasibility at a new site, in a new facility, is wrong. The hearing examiner finds that the objector, Milcrest Nursing Center, has failed to present a preponderance of evidence showing the proposed project is not financially feasible for the applicant. [Report and Recommendation at 39.]
A similar issue was addressed by this court in In theMatter of: National Church Residence Care Center (Sept. 20, 1994), Franklin App. No. 93APH12-1741, unreported (1994 Opinions 4425). In addressing appellant's argument that the Certificate of Need Review Board had incorrectly determined that the CON project was financially feasible, this court stated:
 * * * Based upon a review of all the evidence presented by both sides, this court cannot conclude that the CONRB incorrectly resolved the issue of financial feasibility in the present case. As stated previously, this court is to give due deference to the administrative resolution of evidentiary conflicts. While Sharon Woods argues that all of the evidence pointed to the fact that NCR's application was financially infeasible, such is not the case. There was evidence of financial feasibility introduced by both applicants and there were questions raised concerning the actual financial feasibility of both applications. The hearing examiner determined that NCR's application was financially feasible and that decision was adopted by the CONRB. As such, this court finds that the order of the CONRB is supported by reliable, probative and substantial evidence and is in accordance with law. [Id. at 4429-4430.]
As in National Church, evidence of financial feasibility of the replacement project was introduced by both Union Manor and Milcrest. Although the hearing examiner expressed concerns that the projections submitted by Union Manor were overly optimistic, the hearing examiner ultimately concluded that the project was financially feasible. The director of ODH adopted the hearing examiner's decision on this issue. As noted in National Church,
this court must give due deference to the administrative resolution of evidentiary conflicts. As such, this court finds that there is reliable, probative and substantial evidence that the replacement project is financially feasible. Accordingly, the third assignment of error is overruled.
By the fourth assignment of error, Milcrest contends that the director erred in determining that the replacement project was needed. Ohio Adm. Code 3701-12-20(E) provides that the director must consider "the need that the population served or proposed to be served has for the services to be provided upon implementation of the project. * * * "
As discussed in the first and second assignments of error, Union Manor presented reliable, probative and substantial evidence of the need for replacement of the existing facility due to the substandard conditions that exist there. It is undisputed that Union Manor is authorized to operate one hundred twelve beds and that the CON application proposes the relocation of those one hundred twelve beds to a replacement facility. Milcrest, however, argues that the one hundred twelve bed facility is not needed because Union Manor has operated only ninety-five beds since 1995. Milcrest views the proposed project as a de facto addition of seventeen beds, additional beds not needed in the current highly competitive climate in which nursing homes operate in Union County.In support of this argument, Milcrest relies on the testimony of Lehman and Susan Strutner, Milcrest's Administrator, who both testified that the number of nursing home bed days in Union County has decreased over the past few years due to the increase in assisted living, home health, and hospice services and due to a decrease in skilled nursing facility discharges from Memorial.
Union Manor emphasizes that its CON application does not propose the addition of new beds. Union Manor argues that the fact that it has operated at less than full capacity from time to time (due, in large part, to substandard conditions in the existing facility) does not militate against the need for a new facility. Union Manor also argues that demand for nursing home beds has not significantly declined over the past few years. In support of this argument, Union Manor points to evidence establishing that the decrease in nursing home bed days from 1995 to 1996 was 1.36 percent and 3.56 percent from 1996 to 1997. Evidence presented at the hearing also establishes that Milcrest's occupancy rate was ninety-five percent in 1995 and ninety-three percent in 1996 and that the occupancy rate for Heartland of Marysville, a one hundred bed facility located in the city of Marysville, has consistently been at or above ninety-five percent each of the past three years.
In addition, both Boggs and Philip Connoloy, owner of Connoloy Construction Company, the developer of Green Pastures, testified that Marysville is one of the fastest growing communities in central Ohio and that Union County as a whole is also experiencing growth. Connoloy also testified that at focus group discussions held at the time Green Pastures was being developed, participants consistently stated that quality nursing homes were needed in the community.
On the issue of need, the hearing examiner stated:
 * * * [T]he hearing examiner notes that there is no legal authority which would authorize the Ohio Director of Health to approve Union Manor's application at a lesser number of beds than are approved at the existing facility. Union Manor has 112 approved long-term care beds at its facility, and though its occupancy rates have been less than 80% in recent times, this has diminished in no way the license granted to Union Manor by the state of Ohio to operate 112 long-term care beds. Union Manor's application seeks the replacement of 112 beds, and nothing in the facts of this case, under the laws applicable to this case, would authorize a replacement of less than 112 beds.
 The hearing examiner finds need for the replacement facility based on the present condition of Union Manor * * *. The statistics presented by Milcrest Nursing Center as to occupancy rates and payor mix in Union County among the proposed project, Milcrest Nursing Center, Heartland of Marysville, and Union Manor, do not diminish the finding of need based on the present condition of the existing facility to be replaced.
 The hearing examiner finds the replacement of Union Manor Nursing Home to be needed. [Report and Recommendation at 36-37.]
In addition, the hearing examiner found, in findings of fact 44, 45, and 46, as follows:
 44. The replacement of Union Manor by a new facility is needed.
 45. The need for the replacement of the existing facility * * * has been proven by a preponderance of evidence showing Union Manor to be too small, outdated, and, in certain particulars, unsafe.
 46. Decreases in nursing home bed days in Union county from 1995 through 1997 are small and not indicative of a trend in nursing home bed days in Union County.
It is apparent that the hearing examiner considered the requirements set forth in Ohio Adm. Code 3701-12-20(E) and came to the conclusion that Union Manor had demonstrated the requisite need for the replacement project. Affording due deference to the administrative agency's resolution of evidentiary conflicts, we find that reliable, probative and substantial evidence supports the director's determination that the replacement facility was needed by the population to be served. Accordingly, the fourth assignment of error is overruled.
By the fifth assignment of error, Milcrest contends that the director erred in determining that the replacement project will not have a significant adverse impact on Milcrest and Heartland, the other providers of long-term nursing care in Union County. Ohio Adm. Code 3701-12-20(F) requires the director to consider "the impact of the project on all other providers of similar services in the HSA including the impact on their utilization, market share and financial status."
Specifically, Milcrest argues that Union Manor's projected increases in private pay and Medicare resident populations in the replacement facility will have a significant adverse financial impact on Milcrest and Heartland because those two types of residents are a significant portion of Milcrest's and Heartland's business. In support of this argument, Milcrest points to the testimony of Strutner, who, when asked whether Union Manor's projected increase in Medicare patients would negatively affect Milcrest, stated:
 Yes, I do. I think that building the 112 beds will have a significant impact. If the projection is to have a higher capture rate, then there go some of my residents that would be Medicare residents. And to have * * * just an intermediate care facility, I think that we would probably have to close our doors, actually. [Tr. Vol. I, p. 182.]
Strutner continued:
 * * * I don't think there is enough of a demand in the county * * * to sustain the beds in the 112-bed facility, our 50-bed facility, Heartland's 100-bed facility and the facilities around Marysville proper. * * * [Tr. Vol. I, p. 183.]
Upon review of the record, we note that no evidence was offered by Milcrest to quantify exactly what adverse financial impact the proposed project will have on Milcrest and Heartland. In addition, Boggs testified that the increase in Medicare patient volume anticipated for the new facility is in large part due to the fact that eight of the thirty-six beds in the Medicare distinct unit will be dedicated to the respiratory unit and that the market for those services will be significantly wider that the Union County market. According to Boggs, since Milcrest and Heartland do not have respiratory units, any Medicare admissions to the new facility for this care will be new admissions to the county and will not adversely affect the existing providers.
Regarding Milcrest's claim that the new facility will adversely affect its private-pay population and that this population has already been "slipping," we note that evidence in the record establishes that from 1995 to 1997, Milcrest experienced an increase in private-pay population of twenty percent.
The hearing examiner considered and rejected Milcrest's arguments on adverse impact, noting that the project does not propose to add any new long-term care beds to Union County and that Milcrest's Medicare census has traditionally been relatively low:
 The adverse financial impact caused by the replacement of Union Manor to a location nearer Milcrest Nursing Center would be less than the impact which would result from a new, non-replacement facility * * * [.]
 If any impact by a new facility upon Milcrest Nursing Center, even a replacement facility which leaves unchanged the number of nursing home beds in Union County, can serve as the basis to refuse a certificate of need application, no new facility could ever be established in Union County. The hearing examiner does not find any competition from a new facility is grounds to bar it because it will have a negative impact upon existing service providers in the county. [Report and Recommendation at 37.]
The hearing examiner continued:
 While Union Manor's existing facility would be replaced by The Gables at Green Pastures, the new facility would remain county owned, retaining the stigma of being a "county home." This would tend to diminish private pay admissions. There is also Milcrest's relatively low Medicare census over the past three years, which tends to undercut the impact by the proposed project's capture of Medicare discharges. * * * [Report and Recommendation at 37-38.]
In addition, findings of fact 47, 48 and 49 state:
 47. Milcrest Nursing Center will be impacted financially by any new nursing home; the relocation of existing long-term care beds in Union County to a replacement facility in Union County will cause less financial impact than if a new facility were to be added to Union County.
 48. Beyond the impact that any new facility would have upon existing businesses, there is no evidence showing additional adverse financial impact sufficient to refuse the certificate of need application on this basis.
 49. Union Manor's projected increase in Medicare discharge captures at the proposed facility and the impact of this increase upon Milcrest Nursing Center is diminished in its effect because of Milcrest Nursing Center's relatively low Medicare census in recent years, and the fact that only one-half of Medicare discharges occur in Union County, increasing the pool of candidates for Medicare admissions from out of county discharges.
It is clear that the hearing examiner considered the evidence of adverse impact of the replacement project on the other providers of long-term nursing care in Union County as required by Ohio Adm. Code 3701-12-20(E). Upon review of the evidence presented, this court cannot conclude that the hearing examiner and the director incorrectly resolved the issue of adverse impact. Because reliable, probative and substantial evidence supports the director's finding on this issue, we overrule the fifth assignment of error.
By the sixth assignment of error, Milcrest maintains that the director erred in finding that the replacement facility will meet the needs of the medically underserved of Union County. Ohio Adm. Code 3701-12-20(I) provides, as follows:
 The director shall consider the effectiveness of the project in meeting the health-related needs of medically underserved groups such as low-income individuals, handicapped individuals and minorities. If applicable, this consideration shall include review of the applicant's historical experience in meeting the needs of under-served groups.
In support of its contention, Milcrest relies solely upon Union Manor's projections of a slight decrease in the number of Medicaid residents to be served by Union Manor in the replacement facility (from fifty-eight in 1997 to fifty-four in 2002). However, no evidence suggests that access to Medicaid-certified beds will be impaired or that fewer provisions will be made for the needs of the underserved. As noted throughout the record, Union Manor's existing facility is substandard thirty-four of the fifty-nine rooms are smaller than the state-required minimum and, therefore, require a waiver from the state; twenty-three rooms do not have bathrooms, requiring residents to travel down the hall to community bathrooms; residents' rooms are not air-conditioned; and significant problems exist throughout the facility regarding the heating, plumbing and electrical systems. Relocation of the beds to a new facility will undoubtedly improve the type, quantity and quality of services available to all residents, including those who are Medicaid-eligible. Further, slight differences in the number and percentage of Medicaid residents to be served by the new facility does not reflect at all upon the level or availability of services expected for Medicaid residents. In addition, evidence establishes that, historically, Union Manor has been a prominent provider to the Medicaid population in Union County despite less than ideal conditions. In both 1995 and 1996, Union Manor provided more days of services to Medicaid residents than any other facility in Union County. In addition, the projections submitted by Union Manor indicate that Medicaid residents will constitute a full fifty percent of the census at the new facility.
In rejecting Milcrest's arguments on this issue, the hearing examiner stated:
 The hearing examiner finds that the projected decrease in Medicaid admissions at the proposed facility will not reduce the effectiveness of the proposed facility in meeting the needs of medically underserved groups. The proposed facility projects a 50% census of Medicaid residents, and is to be owned and operated by a County which historically has provided more in the way of services to the medically underserved than other long-term care service providers in Union County. [Report and Recommendation at 39-40.]
Additionally, in finding of fact 51, the hearing examiner found:
 Union Manor Nursing Home, as a Union County nursing home, has served many more Medicaid patients, both in real numbers and by percentage of census, than either of the other nursing homes in Union County.
The hearing examiner clearly considered the effectiveness of the proposed replacement facility in meeting the needs of the medically underserved in Union County, including Union Manor's historical experience as a county nursing home in meeting those needs. Upon review of the evidence presented by both parties, this court cannot conclude that the hearing examiner and director improperly found that the proposed project will negatively impact the medically underserved. Accordingly, the sixth assignment of error is overruled.
Having overruled each of Milcrest's six assignments of error, this court hereby affirms the order of the director of the Ohio Department of Health.
Order affirmed.
BOWMAN and TYACK, JJ., concur.